CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, APPELLANT, V. PLATTE VALLEY DRAINAGE DISTRICT, APPELLEE.

FILED DECEMBER 31, 1924.   No. 24161.

Drains: ASSESSMENTS. Evidence examined, and *held* insufficient to sustain the special assessments complained of.

APPEAL from the district court for Colfax county: FREDERICK W. BUTTON, JUDGE. *Reversed, with directions.*

*Byron Clark, Jesse L. Root* and *J. W. Weingarten,* for appellant.

*Dolezal, Spear, Mapes & Stevens, Albert & Wagner, John C. Sprecher* and *George W. Wertz, contra.*

Heard before MORRISSEY, C. J., DAY, GOOD and THOMPSON, JJ., REDICK and SHEPHERD, District Judges.

REDICK, District Judge.

The case involves the validity of a drainage district assessment and the apportionment of benefits. Some preliminary matters require disposition.

Objection is made by appellee to the jurisdiction of the district court and of this court, upon the ground that the transcript filed in the district court did not contain a copy of the apportionment of benefits. The first certificate of the clerk was defective in this particular, but we think it substantially appears from an amended certificate that the apportionment appearing in the transcript was a copy of the record thereof required to be filed in the office of the county clerk.

It is further objected that appellants have no right of appeal, because they did not appear before the board of the district and make their objections prior to the apportionment, and further, in this connection, that the objections now made to the apportionment cannot be urged because not made before the board. Cases from Iowa are cited in support of this contention, but the statute of that state is different from ours, which, at the time of these proceedings, contemplated merely the filing of a protest with the county clerk against such apportionment within 20 days from the third publication thereof, with a bond, whereupon the county clerk was required to file a transcript of the proceedings in the district court, which would then become possessed of the appeal. Rev. St. 1913, sec. 1878. These requirements were complied with.

Appellee also moves to dismiss the cross-appeal of the county of Colfax for failure to file a præcipe therefor within four months from the date of the judgment. The judgment was dated April 21, 1924, and the præcipe on behalf of the county July 16, 1924. We are unable to discover any foundation for this motion, unless counsel rely upon the fact that the præcipe is not signed. However, it contains the name of the cross-appellant and complies with the rule in all respects, and, that the præcipe should be signed is not one of the requirements. We now proceed to the merits of the case.

In 1917 the Platte Valley Drainage District was duly organized and its boundaries defined. It comprised 7,985 acres included in a strip of territory about eight and one-half miles long and varying in width from about one-half mile at the west and coming to a point at the east end. The southern boundary was the north bank of the Platte river; the northern boundary was irregular, with a number of offsets, but following the lines of governmental subdivisions. As frequently happens in this part of the country, and particularly the Platte river valley, the channel proper of the river lies some distance from the bench lands on either side which at one time formed the river banks, the action of the current cutting the channel and forming the banks which in ordinary stages confine the waters to the channel thus formed. In the Platte river there are generally several channels between these later formed banks, which may be in one place today and another tomorrow, that is, the channels wander about between the banks, adopting different courses, but in the ordinary stages of the water do not overflow the banks. The bed and banks of the river are composed of sand and silt, and, as the engineers put it, the waters of the Platte carry an overburden of this material, the amount of such burden being determined by the velocity or sluggishness of the current; when the current is swift the sand and silt is carried in suspension, and when the current is retarded the foreign matter is deposited in proportion. The above describes in general terms the conditions in the Platte river adjoining the drainage district. Between the northern boundary of the river and the northern boundary of the district, which conforms generally with the line of the bench land, is a swale or slough, through the northern portion of which runs a channel referred to in the evidence as Leech creek. It starts at the western boundary about half a mile from the river, and proceeds in a northeasterly direction for about four miles, where it is about a mile and three-quarters from the river, and then passes eastwardly, maintaining that distance for over two miles,

and thence northeasterly to the eastern boundary of the district, where it empties into the Platte. The bottom of this channel is on an average four feet below the level of the water in the Platte river, but from seven to nine feet above the bed of the Platte. There is some water flowing through Leech creek at all times, but in times of high water the Platte overflows and enters the creek, which then becomes an important factor in the situation. The north bank of the Platte is higher than the territory between it and the creek, but not uniformly so, varying from three to eight or nine feet, and even though the water of the river is not high enough to overflow the entire bank, it enters the slough at various points along the north boundary, so that the slough is generally subject to overflow, regardless of the structure, hereinafter mentioned, placed in the river by the drainage district. In fact, it is conceded that the operations undertaken by the district were not for the purpose of preventing overflow of the lands therein, and that in times of high water overflows occur the same as before. The channel of Leech creek approaches the north bank of the river at its closest point about 400 feet, a quarter of a mile east of the western boundary of the district, about the center of the southwest quarter of section 31. At the time of the government survey the river bank was represented by an irregular line beginning on the west line of section 31 extended south 500 feet, and running northeasterly to a point a short distance east of the quarter-section line, along the line for about one-third of a mile, and thence southerly, crossing the east line of the section extended about 300 feet. The bank thus described was eroded by the action of the water until in 1920 the north bank was represented by a curved line, beginning near the southwest corner of section 31, crossing the quarter-section line about 750 feet, the half-section line at 1,250 feet, the next quarter-section line at 950 feet, and the east section line at 600 feet north of the former survey. That process of erosion continued until it was feared by the authorities of the district that it would destroy the high

ground intervening between the river and the channel of Leech creek, upon the junction of which it was thought the river would adopt the channel of the tributary, casting a large volume of water therein and destroying the lands along Leech creek and causing great damage to county roads and the railroad, to which reference will now be made.

About the center of the district east and west, appellant railroad company maintains its line across the district north and south for a distance of about one and two-thirds miles, including three bridges of trestle work, one at the north about 370 feet long, crossing Leech creek, which it was thought might be destroyed by a change of channel of the river, and one about 250 feet south thereof, and a third about midway between the creek and the river, which do not enter seriously into the problem. The county of Colfax maintains a main highway across the slough paralleling the railroad at about three quarters of a mile west, on which are three bridges, and other highways in the district, all totaling nine and one-half miles, with six bridges.

The authorities of the district employed an engineer, who expressed the opinion that there was danger that the Platte river would continue eroding the north bank in section 31 until it broke through into the channel of Leech creek, throwing a great volume of water therein which would follow its course to the creek's outlet at the eastern end of the district, being unable to return to the river by reason of the high elevations; that it would cut a channel all the way about 1,000 feet in width, would destroy a great many acres of land and cause great damage to the roads and bridges of the county and the railroad. To prevent further erosion, he advised the construction of a barrier about 1,500 feet in length extending from the north bank of the river in an easterly direction to an island, and composed of huge concrete blocks connected by cables, to which should be strung about 300 trees, which would float

,and form a screen tending to retard the current and thus induce the deposit of the foreign matter carried by it to form a sand-bar, and thus turning the course of the river away from the threatened bank. The plans and suggestions of the engineer were adopted by the district, and the work was constructed at an expense of $18,000, and the assessment in question levied upon the lands in the district and upon the railroad and county to pay the same, according to the supposed benefits received. Section 1876, Rev. St. 1913, requires the board to "apportion the benefits thereof accruing to the several tracts of land within the district which will be benefited thereby, on a system of units. The land least benefited shall be apportioned one unit of assessment and each tract receiving a greater benefit shall be apportioned a greater number of units or fraction thereof according to the benefits received." In compliance with this statute the board determined that a certain two-acre tract would receive the least benefit, which it fixed at $20.. It then proceeded to apportion the benefits to the other tracts of land in the district, the total number of units so apportioned being 6,832. As to the reasonableness of this apportionment we will have something to say a little later on. To the railroad company it apportioned 2,500 and to the county 3,525 units, the total number of units being 12,857, which applied to the cost of the work, $18,000, determined the amount of each unit at $1.40, and the assessment upon each tract or property was obtained by multiplying the number of units assigned thereto respectively by $1.40. The assessment of the railroad company, therefore, was $3,500, and that of the county $4,935, and to the lands $9,554.80. It will thus be observed that, while the district contains 7,985 acres worth about $700,000, and the damage threatened the railroad and county according to the highest estimates in the evidence was $240,000, nearly 47 per cent. of the expense of construction was apportioned to the railroad and the county, whose appeals therefrom are now being considered.

The railroad company presents three propositions: (1)

That it received no special benefits from the construction; (2) that the units of benefits apportioned to the other lands in said district are less than those by each separate tract received; (3) that the plans and specifications of the work to be done will be ineffective as to the lands, railroad-bed and bridges of the railroad; and presents these questions by proper assignments of error. The county presents substantially the same questions and they may be generally considered together.

It is suggested that the second objection is insufficient to call into exercise the judgment of the court as to the amount of the apportionment to the railroad, on the ground that the railroad may not complain that other property is assessed too low, but may only object that its property is assessed too high in proportion. This principle has greater application to proceedings before boards of equalization of assessments for taxation for general purposes, but we think in connection with the first proposition it is sufficient, especially in view of the fact that the question was fully tried in the district court without objection to the evidence offered thereon.

The claim of the appellant presented by the first and third propositions is that the possibility of the Platte river adopting the course of Leech creek as one of its main channels is purely a matter of conjecture and speculation so far as the opinions of appellee's witnesses are concerned, and that the testimony of appellant's witnesses is sustained by reason, scientific propositions and actual experience. The engineer of the district and two others called by appellee expressed the opinion that there was grave danger of the Platte adopting the channel of its tributary, but concede they have no knowledge of such an occurrence having taken place. These witnesses do not show themselves possessed of any special qualifications to form an opinion upon the subject; they present no knowledge of any instance where the parent stream connecting with a tributary above the point of confluence had adopted the course of the tributary, and their conclusions are based principally upon

the fact that the bottom of the tributary channel is lower than the surface of the water of the parent stream at ordinary stages, and a special study of the local situation and conditions, aided by their general education as engineers. On the other hand, the railroad company produces three engineers showing special qualifications in the way of education and experience to form an opinion on the subject, who testify that there is no possibility of the river changing its channel in the manner feared. And they support their opinions by citing several instances in which a junction between the parent and tributary streams was accomplished by erosion, and in every instance it resulted in the tributary entering the parent stream at the new point and abandoning its former channel, which thereafter was either filled with silt or became a succession of sloughs, and that such would be the result in case of a junction of the river with Leech creek. They support their conclusions with reference to the particular situation by the facts that the Platte river carries an overburden of silt, that when the current is retarded a part of the organic matter carried is deposited, thereby forming a bar, that this has happened in a number of instances where an irrigation canal has been filled up and a cross-bar formed across its mouth. They therefore conclude that if the Platte river by erosion should reach the channel of Leech creek, while in high-water stages a considerable quantity of water might pass down the creek, the action of the water would have a tendency to erect a bar across Leech creek, thereby causing the waters of the river to return to their former course in a very short time.

While this conflict in the evidence presents a question which, considered in the abstract, might compel us to hold that the weight of the evidence favors the appellant, still as a practical question upon the determination of which boards of supervisors and other agencies of government must exercise their judgment and base their action, the solution is not so easy. While in the opinion of appellant's witnesses a junction of the two streams would have no in-

jurious effect upon the railroad and county properties, still it may be fairly inferred from the evidence that a volume of water considerably in excess of normal would be thrown into the creek and thus subject such properties and the adjacent lands to increased chances of injury by the event, as well as in subsequent times of overflow.   The dispute is as to the permanence of that situation.   Notwithstanding the fact that the evidence seems to preponderate in favor of appellant, the matter remains one of opinion.   No one can assert with certainty what the action of the waters of the Platte will be when nature takes the stage to put on a deluge.   The authorities of the district, in adopting the plan they did, appear to have acted in perfect good faith, upon advice of an engineer, for the purpose of forestalling an apprehended danger, which, though probably not so serious as it appeared to them, was nevertheless of such doubtful character as to call for action of some kind.   The adoption of the plan was committed by the statute to the judgment and discretion of the board, and their finding should not be upset unless it is so lacking in reasonable foundation as to warrant an inference of bad faith, or of a total failure to exercise their judgment.   The fact, if conceded, that they adopted a plan involving greater expense than some other, as suggested by appellant's evidence, the effectiveness of which plan likewise rested upon opinions of experts, will not render void their judgment. It would not be the first time that mistakes of official judgment resulted in loss to the property owner.   We are, therefore, of the opinion that the finding of the board to the effect that the properties of the railroad and county would receive some benefit is not unreasonable, and that the cost of the improvement may be properly laid upon the lands and property in the district to the extent of special benefits accruing thereto.

We will now examine the basis and apportionment of benefits and the assessment thereof.   A benefit may consist of an increase in value or the prevention of damage or loss, and the assessment in question was based upon that

proposition. It was thought that the prevention of an increased flow of water through Leech creek would benefit the lands of the district by increasing their value for farming purposes, and would benefit the railroad and county by reducing the danger of damage to roadways and bridges with consequent increase in the expense of maintenance and repairs. This was a reasonable basis for the assessment.

The apportionment of benefits, however, presents the most difficult problem, and we must not lose sight of the fact that the amount of special benefit in almost every case is to a great extent based upon theory, and absolute equality cannot be attained. The most that can be demanded is that the apportionment be fair and reasonable among the different tracts. The engineer of the board found that a certain tract of two acres was least benefited, and that it was increased in value $20, which was the unit of assessment. He then assigned to the different tracts of land the number of units which in his judgment they were respectively benefited, to the extent of 6,832 units. The number of units assigned to each tract was determined by a consideration of its assessed value, approximately one-fifth of its market value, which he places at $50, $75, and $100 an acre. The only exceptions to this rule of apportionment are a few tracts in sections 31 and 32 which are subject to erosion by the river. No question of the apportionment as between the respective tracts of land is before us. The board adopted the plan of the engineer. Assuming that a new channel 1,000 feet wide would be cut through Leech creek, about 1,200 acres would be destroyed, of the value of $120,000; the assessment on these lands was about 1.25 per cent. to 1.40 per cent. of their value. The engineer then allotted 2,500 units of benefit to the railroad, or a total benefit of $50,000, resulting in an assessment of $3,500. It will thus be apparent that, the lands being charged as a rule with benefits upon the basis of one-fifth their value, it follows, the value of a beneficial unit being $20, 2,500 units equals $50,000, from which would be de-

rived a total value of $250,000, but by the evidence the greatest value placed upon the one and two-thirds miles of track and bridges is $90,000; and the maximum cost of constructing a bridge 1,000 feet long over the "phantom stream," as appellant's counsel characterizes it, is $90,000. While evidence on the part of the railroad was to the effect that it could be built for $20 a foot, the evidence shows that two spans of 14 feet each erected after the flood of 1912 cost $1,500 or an average of $54 a foot. We think it fairly appears that the board fixed the probable total damage saved the railroad at $50,000; 3,525 units were assessed against the county, a total of $70,500 benefits, resulting in an assessment of $4,935. The engineer testified that he fixed the value of the lands for the purpose of the apportionment at one-fifth their market value, and that he assessed the county on a different theory, *i.e.*, "what the benefits would be." He also testified the damage to the county which would result from a change of channel he would estimate at $150,000, that the county would have to build a bridge 1,000 feet long and rebuild a number of other bridges and roads. The figure given is without support in the evidence, except that it is the opinion of a reasonably competent engineer, but one who has not made any figures which would dignify it as an estimate. Perhaps the figure $70,500, adopted as the total benefit, may be accepted as a good guess. But this last figure is five-fifths of the saving to the county, which corresponds to five-fifths of the value of the land saved, but which was charged benefits on the basis of one-fifth only.

We think it appears from the record that the lands were charged on the basis of one-fifth their value, while the railroad and the county were charged on the total value of the losses saved, and that this has resulted in an unequal apportionment; that the railroad should be charged with 500 units and the county with 705 units. The assessment of the railroad is reduced to $700, and that of the county to $987.

The judgment of district court is reversed, with instructions to enter decree in conformity with this opinion.

REVERSED.